# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

## DOCKET NO. 3:06-CV-104-FDW

| | |
|---|---|
| DEAN A. VAUGHAN, et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>CELANESE AMERICAS )<br>CORPORATION, et al., )<br>)<br>Defendants. )<br>)<br>) | **MEMORANDUM<br>AND ORDER** |

THIS MATTER came before the Court on July 23-25, 2007, for a bench trial on the issue of whether there was improper extrinsic influence on the benefits committee that might have adversely impacted the independence of the committee's interpretation of the Celanese Americas Corporation Separation Pay Plan (the "Plan") (Pl.'s Trial Exh. 1). After hearing and weighing the evidence presented at trial, and announcing its findings in open court, the Court determined as a matter of fact that Plaintiffs did not prevail on this issue. Accordingly, and despite the fact that the fiduciary was acting under an inherent, albeit minimal, conflict of interest in that the Plan was unfunded and self-insured by Celanese, the Court determines as a matter or law that no reduction in the deference given to the discretionary decision of the benefits committee is necessary to "neutralize any untoward influence resulting from [a conflict of interest]." Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 343 n.2 (4th Cir. 2000). The Court will now proceed to its analysis of the remaining Booth factors as briefed in the parties' cross-motions for summary judgment, since no material fact remains in

dispute.[1]

The primary legal issue remaining is whether the benefits committee abused its discretion when it interpreted the term "compensation" – as it is used in the Plan such that employees are eligible for separation pay when a part of the business is sold in a divestiture transaction and "the successor employer does not offer continued employment at a comparable level of compensation" – so as not to include non-salary benefits (such as health insurance, pension, 401k, etc.). Thus, under the benefits committee's interpretation of the Plan, Plaintiffs are not eligible for separation pay because when Celanese sold the division which employed Plaintiffs (PBI acetate) to InterTech Group, they were offered continued employment with InterTech at equivalent salary, notwithstanding the fact that InterTech offered inferior benefits. Plaintiffs may prevail only if they can demonstrate that the benefits committee's decision was so unreasonable, as analyzed under the framework of the eight factors set forth in Booth, 201 F.3d at 342-43, as to amount to an abuse of discretion.

The first Booth factor to be considered is the extent to which the benefits committee's decision comports with the express language of the Plan. See Hickey v. Digital Equip. Corp., 43 F.3d 941, 947 (4th Cir. 1997) ("The award of benefits, under any ERISA plan, is governed in the first instance by the language of the plan itself."). The term "compensation" is ambiguous and not otherwise defined in the Plan, so the benefits committee, exercising discretionary authority conferred by the Plan document, made the determination that "compensation" should be construed so as not to include benefits other than salary. While the Court sympathizes with Plaintiffs' position that

---

[1] Where appropriate, the Court supplements the summary judgment record with uncontroverted testimony that was received during the course of the bench trial. Because the court reporter had not finished the official trial transcript by the time this Order was issued, the Court cites to the draft transcript ("Draft Trial Tr.") by volume and page, with its apologies for the fact that pagination may change upon publication of the official transcript.

common usage and understanding of "compensation" in the HR context typically includes an employee's retirement and benefits,[2] a reviewing court is not to substitute its own interpretation or colloquial meaning in place of the discretionary judgment of the fiduciary if properly exercised in a reasonable manner. Booth, 201 F.3d at 344; de Nobel v. Vitro Corp., 885 F.2d 1180, 1188 (4th Cir. 1989). Furthermore, Celanese is not guilty of ipsedixitism by justifying the benefits committee's interpretation by reference to its inherent discretionary authority, because ERISA's policy in favor of deferring to a fiduciary's discretionary judgment is most fitting when there are no compelling reasons to adopt one result over another (for example, where, as here, a key term is undefined and reasonably capable of sustaining more than one meaning). Thus, the language of the Plan does not in any way militate against the reasonableness of the benefits committee's decision.

The second Booth factor is the extent to which the benefits committee's decision effectuates the purposes and goals of the Plan. Celanese argues that the purpose of the Plan is to serve as an "income replacement" benefit, citing to the fact that the Plan pays out a lump-sum cash benefit, and also to the fact that three of the four possible situations where an employee would be eligible for separation benefits under the Plan would typically involve an interruption in employment (and thus a potential lapse in income). The force of this argument is limited, however, by the fact that the provision of the Plan under which Plaintiffs claim an entitlement to benefits clearly does not require an actual interruption in employment, and the formula for calculating severance benefits is tied more to an employee's past service (at one week of salary for each year of employment) than it is to any real loss in income. Thus, Plaintiffs contend that the purpose of the Plan reasonably could be

---

[2] Indeed, various HR-related pages on Celanese's own website use the term "compensation" in this broader sense. (See Pl.'s Trial Exh. 9.)

interpreted to provide a "financial cushion" that rewards employees for their past service to the company, and which provides a monetary incentive to continue their employment after Celanese has sold a line of business, when the terms and conditions of employment offered by an acquiring company are less favorable than those provided by Celanese. Courts have recognized that the income replacement objective and the reward/incentive objective may both be legitimate purposes of a separation pay plan. Bradwell v. GAF Corp., 954 F.2d 798, 801 (2d Cir. 1992). Here again, however, when there are two competing but reasonable purposes attributable to an ERISA plan, the fiduciary's discretionary interpretation will ordinarily prevail.[3]

Furthermore, the Plan document does on its face provide some relevant guidance as to the Plan sponsor's purposes and goals in establishing the Plan. Article VI of the Plan (captioned "Determination of Eligibility for Benefits") provides that "the Company shall generally consider . . . whether payment of benefits . . . would result in an unjustified benefit to the Participant." In this case, it is disputed whether or not payment of severance benefits to Plaintiffs would in fact result in an unjustified windfall: Plaintiffs claim that the present value of the reduced benefit levels greatly exceeds the severance payment they would otherwise receive under the Plan, while Celanese's position is that the present value loss to Plaintiffs is too speculative and that a more equitable method

---

[3] To further demonstrate the many variant purposes for which a severance plan may be put into effect, the Court, had it applied *de novo* review, would have considered adopting an interpretation of the Plan different from both the interpretations urged by Plaintiffs and Defendants. In the Court's judgment, another highly plausible reading of section 1.10(c) (in conjunction with the surrounding provisions of the Plan and the common purposes of severance plans generally) is that it is intended to provide separation pay where the terms and conditions of employment offered by the successor employer are so inferior as in essence to amount to a constructive discharge from employment. Under this reading, eligibility would turn not so much on the meaning of the word "compensation" (it is certainly possible to envision a scenario where a reduction in benefits is so marked as to result in a constructive discharge) as it does on the meaning of "comparable level." Because neither side has advocated this reading, the Court raises it only to illustrate the wide range of reasonable options from which a fiduciary must choose when settling upon an authoritative interpretation.

4

of compensating Plaintiffs for any loss of benefits (although not required by the terms of the Plan) would be to pay them an "enhanced pension benefit" of about one-third the value of the Separation Pay Plan benefit. Yet this dispute – which the Court did not attempt to resolve at trial – is not a material one, because the record indicates that the benefits committee believed that payment of severance benefits to Plaintiffs could result in a windfall; and this belief, if itself reasonable, would support the reasonableness of the benefits committee's interpretation of the Plan as an effort to avoid the unintended windfall. Hickey v. Digital Equip. Co., 43 F.3d 941, 948-49 (4th Cir. 1995). A number of undisputed facts favor Defendants on this issue. First, Celanese recognized that ERISA's primary purpose is to protect benefits that have been earned and vested, and so it would seem counter-intuitive to establish a Plan that pays severance benefits based on a reduction in future benefits as a result of a divestiture, given that Celanese could prospectively reduce the benefits that it provides its own employees at any time and the aggrieved employees would be without recourse. (Smith Trial Depo. 19:8-20.) This insight also exposes several questionable assumptions upon which Plaintiffs based their calculation of the present value of lost benefits, such as the assumptions that the difference between Celanese benefits and InterTech benefits would not fluctuate over time and that each of the Plaintiffs will continue their employment for a certain additional number of years (e.g., until retirement age). Second, Celanese did not summarily disregard Plaintiffs' complaint about reduced benefits, but even went to the trouble and expense of employing the services of an actuarial firm to analyze the differences in benefits packages and to calculate an amount (the "enhanced pension benefit") that would fairly compensate Planitffs for reduced retirement benefit levels based on much less speculative assumptions and consistent with common industry practice. (Draft Trial Tr., Vol. II, pp. 25, 41; Pl.'s Trial Exhs. 16, 24-25.) As noted above, the amount

calculated by the actuary was significantly less than the severance payments to which Plaintiffs claim an entitlement, which supports the benefits committee's determination that the payment of severance based on non-comparability of potential future benefits could result in an unjustified windfall to Plaintiffs.

The third Booth factor addresses the adequacy of the materials considered to make the decision and the degree to which they support the decision. There is no written record of the benefits committee's decision in the form of meeting minutes or a documented resolution,[4] and it was this kind of lax business practices that cost Celanese the expense of a trial to determine whether the decision making process had been corrupted. In the course of that trial, however, Ms. Cheryl Cunningham was able to provide the Court with detailed testimony concerning how the committee's decision was reached. In particular, Ms. Cunningham testified that while it initially was her considered opinion that severance payments should be made under the circumstances (Pl.'s Trial Exhs. 27, 40), she and the other members of the benefits committee were persuaded otherwise upon consultation with Plan administrator B.J. Smith and in-house counsel Michael Reap, both of whom brought to light their past experiences in divestiture transactions that severance benefits had never been paid to employees who continued their employment with an acquiring company at comparable salaries and that doing so simply would (for reasons previously discussed) not make sense. (Draft Trial Tr., Vol. II, pp. 30-33.) Although, as discussed more fully below, these inquiries into past corporate practice did not serve to establish precedent, at the very least they tend to refute Plaintiffs' claim that the benefits committee made an insufficient effort to apply the Plan consistently or reach

---

[4] This in spite of the fact that the corporate resolution creating the benefits committee requires that the committee "keep written records of each committee meeting." (Pl.'s Summ. J. Exh. 11.)

and informed and considered decision.

The fourth Booth factor is the extent to which the fiduciary's interpretation was consistent with earlier interpretations of the Plan. Celanese attempts to argue that its policy has never been to give separation pay to employees who have continued employment after a divestiture. (Smith Trial Depo. 16:20–22:13.) Notwithstanding the fact that this may have been a sound policy and that B.J. Smith's beliefs to this effect may lend support to the benefits committee's decision when considered under the other Booth factors, the record simply does not support a conclusion that there was established precedent against paying severance to employees similarly situated to Plaintiffs. Notably, throughout this period of time the Plan had been largely disregarded because Celanese had developed its own informal policy for paying severance, and plan administrator B.J. Smith admits that because of this he never even bothered to read the Plan until around the time Plaintiffs filed their claim. (Smith Trial Depo. 13:18-25.) Indeed, Plaintiffs claim for separation pay was the first formal claim ever made under the Plan, and consequently the first time that the benefits committee was obligated to act *qua* fiduciary in making an authoritative eligibility determination under the Plan. (Draft Trial Tr., Vol. II, pp.132-33.) Therefore, Celanese's informal business practices are simply not relevant to this matter.

For the same reasons, Plaintiffs' argument that the Vectran divestiture establishes binding precedent must also fail. Vectran was a component division of Celanese that was sold in a divestiture transaction just months before the division that employed Plaintiffs (PBI) was likewise sold. Much like PBI, the Vectran employees were concerned that the benefits package offered by the acquiring company was materially inferior, and threatened to file claims for separation pay under the Plan as a result. Importantly, however, no claim for benefits was ever filed by any Vectran

7

employee, and each of the Vectran employees agreed to compromise any claim they might otherwise have under ERISA in exchange for a "signing bonus" that had, as a component, the amount of money those employees otherwise would have been able to recover under the Plan. Treating the Vectran "signing bonus" as precedent for Plaintiffs' claims for severance benefits would undermine two important public policies: first, it ignores a vital distinction in the area of ERISA law that ERISA's fiduciary obligations do not extend to purely "corporate behavior" beyond the pale of Plan administration; and second, it would run afoul of the kinds of policies embodied in Fed. R. Evid. 408, which generally discourages the use of a willingness to compromise a potential claim as an admission of liability. Thus, without a prior instance where a claim under the Plan had actually been asserted by a claimant and decided by the benefits committee, the Court determines that the fourth Booth factor is inapplicable.

Nevertheless, the Court does consider the facts surrounding the Vectran divestiture relevant to the fifth Booth factor, which requires consideration of whether the decisionmaking process was reasoned and principled, as opposed to arbitrary or capricious. Despite a disingenuous attempt to argue otherwise, Celanese must own up to the fact that internal pre-closing emails persuasively demonstrate that a fundamental assumption underlying the negotiation of the Vectran divestiture was the belief that Celanese would have a legal obligation to pay severance due to a material reduction in benefits. (Pl.'s Trial Exhs. 13, 14, 15.) Moreover, Ms. Cunningham (whether acting in the capacity as business advisor or benefits manager) relied upon the same assumption when she initially made the recommendation that Plaintiffs receive separation pay. (Pl.'s Trial Exhs. 27, 40.) It was only as a result of a hasty, undocumented teleconference held the next day at the behest of Jay Townsend (a non-fiduciary business partner who had an apparent conflict of interest in keeping the

cost of the sale as low as possible) that Ms. Cunningham abandoned this assumption and came to understand that differences in benefits should not trigger an obligation to pay severance under the Plan. (Draft Trial Tr., Vol. II, pp. 30-32.) While the Court has already determined that Mr. Townsend did not exercise any undue influence over the benefits committee's ultimate decision that day, it still must be considered whether this sudden change of position can be shown to be the product of a reasoned and principled decision making process. Yet there are some important differences between the Vectran and PBI divestitures which help to inform the Court as to why it would have been reasonable for Celanese to question the soundness of the assumption that severance would be payable in the context of the latter transaction but not the former.

As Jon Lillian testified, Vectran was a start-up business that was losing approximately $500,000 per year at the time of its sale. (Draft Trial Tr., Vol. II, p. 165.) And because its principal product was still in the stages of research and development, the intellectual capital of the seven Vectran employees was one of the business's most significant assets. (Draft Trial Tr., Vol. II, p. 175.) Accordingly, it made good business sense for Celanese to make concessions necessary to close the deal and keep the employees happy enough to continue their employment with the buyer. (Draft Trial Tr., Vol. II, p. 23.) PBI, however, presented a much different scenario: It was a mature business with over $4 million in annual profits, and human capital was not as much of a critical asset of the business. (Draft Trial Tr., Vol. II, p. 175.) Moreover, the buyer of PBI was attempting to nickle and dime Celanese by conditioning half of the agreed-upon cash sale price on "earn outs" tied to the company meeting certain future performance goals. (Draft Trial Tr., Vol. II, p. 161-62.) Thus, Celanese had a legitimate reason to scrutinize the PBI transaction for available cost-saving measures and less of a need to appease the employees. This supports Celanese's position that the sudden

9

impetus to reexamine the Plan and reconsider the assumptions about whether incomparable benefits would trigger eligibility for severance pay was neither arbitrary nor capricious. So even if the facts, when viewed in the light most favorable to Plaintiffs, fail to establish that the decision making process was particularly methodical or well reasoned, this Booth factor is at least neutral.

The sixth Booth factor is whether the decision was consistent with the procedural and substantive requirements of ERISA. Plaintiffs point to a number of procedural irregularities in the way that the benefits committee handled the claims, which all take root in the undisputed fact that the benefits committee's interpretation of the Plan was decided upon before the sale of PBI closed and well before Plaintiffs had an opportunity to submit formal claims. Accordingly, Plaintiffs argue that denial of their claims was foreordained and that they were effectively denied the "full and fair review" required by ERISA. As Ms. Cunningham pointed out, however, it is in no way extraordinary that the benefits committee would have reached a conclusion as to whether severance benefits would be paid prior to the closing of the divestiture transaction, because the business partners negotiating the deal would have needed to anticipate with a reasonable degree of certainty all of the transaction costs that would be incurred by the sale. (Draft Trial Tr., Vol. II, pp. 36, 47.) So long as the decision makers were fiduciaries acting in their capacity as such and the decision they reached was informed and reasonable,[5] ERISA should not be construed so as to require important decisions concerning Plan administration to be withheld until a formal claim has been presented – especially where the fiduciary's decision will impact the bottom line of a business transaction. Thus,

---

[5] This is why the Court's analysis of the other Booth factors focuses on the June 22, 2005, decision concerning the interpretation of "compensation" which occurred prior to the closing of the PBI divestiture, and not the decisions on Plaintiffs' formal claims for benefits and the appeal of their initial denial (which occurred on September 21, 2005, and December 29, 2005, respectively).

while the denial of Plaintiffs claims was in a sense foreordained, it was not unreasonable or improper because the preliminary decision cannot be shown to be unreasonable under the circumstances. Neither is this result fundamentally unfair: Just as Celanese needed to anticipate the financial obligations that the PBI sale would trigger, advance notice by the benefits committee on the eligibility determination actually benefitted the PBI employees by aiding them in their decisions concerning whether to accept continued employment with InterTech along with the "enhanced pension benefit" that Celanese offered as a concession.[6]

The seventh <u>Booth</u> factor considers any external standards which may be deemed relevant to the exercise of discretion. The Court finds that none of the external standards that the parties argue should be consulted impact the reasonableness of the benefits committee's decision given the weight of the other <u>Booth</u> factors.

The eighth and final <u>Booth</u> factor requires consideration of the fiduciary's motives and any conflict of interest it may have. Because the Court had the benefit of a bench trial to determine that the benefits committee, although conflicted, was not influenced by improper motives or authorities, this factor is inapplicable.

The lack of formalities by which the benefits committee's decisions were reached, and the indiscrete mixing of fiduciary and non-fiduciary roles, has not made this an easy case to decide. However, Celanese has produced wholly benign motives and reasons for its decision, and Plaintiffs have failed to carry their burden of persuasion by showing that these explanations are implausible.

---

[6] Additionally, while the Court expresses no opinion on the issue of whether soliciting the input of the Plan beneficiaries is necessary to sustain the reasonableness of this kind of decision made prior to the filing of a formal claim, it is important to note in the context of this case that Plaintiffs, and in particular Bill Lawson, vigorously represented their position on the separation pay issue to the benefits committee during the time frame in which the decision was reached. (Draft Trial Tr., Vol. I, pp. 36-49.)

Some <u>Booth</u> factors weigh in favor of Celanese, and the others are neutral and thus favor deferring to the fiduciary's inherent discretion. The Court therefore concludes that the benefits committee's interpretation of "compensation" to exclude non-salary benefits was not unreasonable, and consequently it was not an abuse of discretion to deny Plaintiffs' claims for separation pay under the Plan. Accordingly, Defendants' motion for summary judgment (Doc. No. 26) is GRANTED and Plaintiffs' motion for summary judgment (Doc. No. 24) is DENIED. The Clerk is DIRECTED to enter judgment in accordance with the Court's Order and close this case.

    IT IS SO ORDERED.

Signed: September 27, 2007

_____
Frank D. Whitney
United States District Judge